**RECEIVED**
IN LAKE CHARLES, LA

APR 12 2006

ROBERT H. SHEMWELL, CLERK
WESTERN DISTRICT OF LOUISIANA

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# LAKE CHARLES DIVISION

| | | |
|---|---|---|
| JOSEPH SMITH, INDIVIDUALLY AND ON BEHALF OF THE MINOR CHILD, JEREMY SMITH, AND JUDY SMITH | : | DOCKET NO. 05-557 (Lead) 05-745(Member) |
| VS. | : | JUDGE TRIMBLE |
| CITY OF SULPHUR, ET AL | : | MAGISTRATE JUDGE WILSON |

## MEMORANDUM RULING

Before the Court is a "Motion for Summary Judgment" (doc. #31) filed by defendants the City of Sulphur and St. Paul Fire & Marine Ins. Co. wherein the movers seek summary judgment in their favor asserting that there is no genuine issue as to any material fact, and they are entitled to judgment as a matter of law. Plaintiffs oppose the motion.

## FACTUAL STATEMENT

Plaintiffs, Joseph and Judy Smith are the owner/managers of Delaine Apartments located in Sulphur, Louisiana. On December 2003, the Smiths leased an apartment to Terry H. Mahaffey. Mr. Mahaffey shot Mr. Smith three times with a shot gun and subsequently committed suicide.

Prior to early March, the Smiths had experienced no problems nor received any complaints from or about Mr. Mahaffey. In early March, 2004, Mahaffey complained to Mr. Smith about a spider in his kitchen. On this day, Mr. Mahaffey asked Mr. Smith what he might do if someone attacked his family or if someone were to pull a gun and shoot him so that he could not protect his

family.[1]

On March 24, 2004, Mr. Mahaffey came to the Smiths' residence and beat on their door[2] and again complained of spiders. Concerned about Mahaffey's behavior, the Smiths called the Calcasieu Parish Clerk of Court's office, the Sulphur City Court and Lake Charles City Court to obtain Mahaffey's background information. The Calcasieu Parish Clerk's office informed Mrs. Smith that Mahaffey was on probation for simple battery.

On that same day, Mr. Smith contacted Officer Larry Bagwell and requested a criminal background check on Mahaffey. Officer Bagwell ran a National Crime Information Computer (NCIC) report. According to the deposition testimony of Joseph Smith and Judy Smith, Officer Bagwell contacted them on March 25, 2005 and advised them that Mahaffey was harmless, but had on his record two prior altercations with police officers.[3]

The NCIC report reflects that in 1986, Mahaffey was arrested and charged with homicide and in 1989, aggravated assault on a police officer. The computer report does not provide a disposition of these two charges. It was later determined that Mahaffey was acquitted on the homicide charge and the other incident was dismissed.[4]

On March 25, 2004, Mahaffey again complained of spiders. At the request of Mahaffey, Mr. and Mrs. Smith went to his apartment to investigate. Mahaffey told the Smiths he thought the spiders were entering the apartment through a crack in the front door. Mahaffey then pointed to a

---

[1] Joseph Smith Deposition, pp. 14, 23-24.

[2] The Smiths lived in a trailer across from the apartments.

[3] Deposition of Joseph Smith, pp. 17-26; Deposition of Judy Smith, pp. 21-23.

[4] Deposition of Bill Morrison, pp. 59-60.

corner of the kitchen ceiling and indicated that there was a spider web there. The Smiths looked in the direction he pointed toward, but there was no spider web. Mr. and Mrs. Smith immediately exited the second floor apartment. As Mr. Smith was leaving, Mahaffey pushed or shoved him. Mr. Smith testified that Mahaffey was trying to shove him over the second floor balcony onto the concrete parking lot below.

Mr. Smith called the Sulphur Police Department. Officers Thomas McKenzie and Calvin Farrell were dispatched to investigate. Officer McKenzie obtained information from the Smiths, but was unable to confront Mahaffey because he had left. Upon Mahaffey's return later that day, the Smiths contacted Officer McKenzie. He and Officer Farrell returned to the apartment and questioned Mahaffey. Officer McKenzie arrested Mahaffey and had him booked. After the booking process, McKenzie issued Mahaffey a citation for simple battery and released him.[5]

On March 26, 2004, the Smiths obtained a five day eviction notice and had it posted on the door of Mahaffey's apartment by a City Marshal. They also installed a new door sweep in response to Mahaffey's complaint of the crack in the door. Later that day, the Smiths observed Mahaffey physically rip off the door sweep from the apartment door. Officer Chester Gremillion was dispatched to the apartment complex to investigate the complaint involving the door sweep. Mr. Smith advised Officer Gremillion of the events that occurred the day before. Mr. Smith maintains that he informed the officer of all of Mahaffey's peculiar and/or threatening behavior. Officer Gremillion prepared a prosecutorial form for simple criminal damage to property and filed an incident report. Again, because Mahaffey had left the apartment, Officer Gremillion could not speak to him.

---

[5] Deposition of Thomas McKenzie, pp. 20-21, 31, 43.

On March 27, 2004, the Smiths discovered a broken window pane at Mahaffey's apartment. They called the Sulphur Police Department to report the incident. Officer Craig Doucet responded to the call. Officer Doucet advised the Smiths that the window may have been broken accidentally. The Sulphur Police Department considered the incident to be a civil matter.

On March 28, 2004, Captain Bill Morrison, a detective with the Sulphur Police Department, following up on the March 26, 2004 door sweep complaint, contacted the Smiths. Captain Morrison requested that the Smiths provide him with statements and to also advise him when Mahaffey returned to his apartment so he could be interviewed. The Smiths provided the statements and notified Captain Morrison when Mahaffey returned.

Captain Morrison interviewed Mahaffey at his apartment on March 29, 2004. In his deposition testimony, Captain Morrison testified that Mahaffey admitted to removing the door sweep.[6] However, because the property damage had not occurred in his presence or in close proximity, Captain Morrison did not arrest Mahaffey and instead sent the complaint to the City Prosecutor for further handling.

On April 1, 2004, upon their return home from Sulphur City Court to complete the Mahaffey eviction process, the Smiths observed Mahaffey's truck parked on the opposite side of the apartment complex from where he normally parked. Mrs. Smith was driving their truck. She went inside their home and obtained a camcorder. Mr. Smith remained in the passenger side of the truck and their 8-year-old son stayed in the back seat. As Mrs. Smith was backing up the truck, Mahaffey appeared at the passenger window. Mahaffey shot Mr. Smith three times with a shot gun before Mrs. Smith was able to drive the truck away. Mrs. Smith immediately drove her husband to the West Calcasieu

---

[6] Deposition of Captain Morrison, p.37.

Cameron Hospital Emergency room. Mr. Smith survived the attack, but was severely wounded.[7] Mahaffey fled the scene and drove to his step-daughter's house in DeQuincy, Louisiana where he committed suicide.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[8] As to issues which the non-moving party has the burden of proof at trial, the moving party may satisfy this burden by demonstrating the absence of evidence supporting the non-moving party's claim."[9] Once the movant makes this showing, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine issue for trial.[10] The burden requires more than mere allegations or denials of the adverse party's pleadings. The non-moving party must demonstrate by way of affidavit or other admissible evidence that there are genuine issues of material fact or law.[11] There is no genuine issue of material fact if, viewing the evidence in the light most favorable to the non-moving party, no reasonable trier of fact could find for the non-moving party.[12] If the evidence is merely

---

[7] Statement of Joseph L. Smith, III, dated May 6, 2004, attached as Exhibit to Deposition of Captain William Morrison.

[8] Fed. R.Civ. P. 56(c).

[9] *Vera v. Tue*, 73 F.3d 604, 607 (5th Cir. 1996).

[10] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

[11] *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

[12] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

5

colorable, or is not significantly probative, summary judgment may be granted."[13]

## LAW AND ANALYSIS

*42 U.S.C. § 1983 and Municipal Liability*

Defendants maintain that they can not be held liable under 42 U.S.C. § 1983 under a theory of *respondeat superior*. Municipal liability under § 1983 "requires proof of three elements: a policymaker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom."[14] *Monell* and later decisions reject municipal liability predicated on *respondeat superior*.[15] Consequently, the unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur[16]; isolated unconstitutional actions by municipal employees will almost never trigger liability.[17] "The three attribution principles identified here – a policymaker, an official policy and the 'moving force' of the policy – are necessary to distinguish individual violations perpetrated by local government employees from those that can be fairly identified as actions of the government itself."[18]

The Smiths have failed to submit summary judgment evidence that would identify a policymaker, policy, or custom formally approved that has the force of law or "moving force" that

---

[13] *Anderson*, 477 U.S. at 249-50.

[14] *Monell v. Dep't. of Social services*, 436 U.S. 758, 694, 98 S.Ct. 2018, 2037 (1978).

[15] *Bd. of Comm'rs of Bryan County v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382 (1997).

[16] Another way to put this is that there must be both municipal culpability and causation; such culpability would include both the involvement of a municipal policymaker and affirmative municipal action. See *Snyder v. Trepagnier*, 142 F.3d 791, 796 (5th Cir. 1998).

[17] *Bennett v. City of Slidell*, 728 F.2d 762, 768 n. 3 (5th Cir. 1874), *cert. denied*, 472 U.S. 1016, 105 S.Ct. 3476 (1985).

[18] *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001).

violated Plaintiffs' constitutional rights. Because Plaintiffs have failed to raise a genuine issue of material fact for trial that the Sulphur Police Department's policies or customs were the moving force behind a constitutional violation, the movers are entitled to summary judgment in their favor as a matter of law.

*§ 1983 and the Fourteenth Amendment*

Plaintiffs maintain that they bring this action against defendants to redress the deprivation of rights secured them by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.[19] The Fourteenth Amendment to the United States Constitution provides that a State shall not "deprive any person of life, liberty, or property, without due process of law."[20] 42 U.S.C. § 1983 creates a federal cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." However, "the benefit that a third party may receive from having someone else arrested for a crime generally does not trigger protections under the Due Process Clause, neither in its procedural nor in its "substantive" manifestations."[21] This result reflects the Supreme Court's "continuing reluctance to treat the Fourteenth Amendment as a "'a font of tort law."'[22]

Plaintiffs, citing *DeShaney v. Winnebago County Department of Social Services*,[23] further maintain that police can be liable to a crime victim if police either "increased the danger" to the

---

[19] Plaintiffs' Complaint, ¶ 2.

[20] Fourteenth Amendment, § 1.

[21] *Castle Rock v. Gonzalez*, 125 S.Ct. 2796, 2810 (2005).

[22] *Parratt v. Taylor*, 451 U.S. 527, 544, 101 S.Ct. 1908 (1981).

[23] 489 U.S. 189, 109 S.Ct. 998 (1998).

victim or had a "special relationship" with the victim. *DeShaney* provides the following:

> [I]n certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals. While the Supreme Court has not ennunciated every circumstance in which this duty attaches, it has held that "[t]he affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf." The Supreme Court has further held that "[i]t is the State's affirmative act of restraining the individual's freedom to act on his own ... which is the 'deprivation of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interest against harms inflicted by other means."
>
> Several circuit courts have recognized that when state actors knowingly place a person in danger, the Due Process Clause renders them accountable for the foreseeable injuries resulting from their conduct. (citations omitted)

The Fifth Circuit has not recognized state-created danger as a trigger of State affirmative duties under the Due Process clause. The *DeShaney* court also declined to recognize this theory. Be that at it may, Plaintiffs argue that the police warned the Smiths against taking matters into their own hands and even threatened the Smiths, stating "I'm here to see that you don't get yourselves in trouble."[24] The Smiths argue that such statements caused them to cancel their plans to move to Carlyss, remain in town, and let their guard down – the final result being that Mr. Smith was shot three times by Mahaffey.

As previously stated the affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitations which it has imposed on his freedom to act on his own behalf. The Smiths have produced no evidence that the Sulphur Police Department put limits on their freedom which prohibited them from acting on their own. Regretfully, the Sulphur Police Department may have stated that Mahaffey was

---

[24] Deposition of Judy Smith, p. 51.

harmless and/or not a danger. However, these statements do not rise to the level of limiting one's freedom to act on his own behalf. Accordingly, we find that there is no duty arising under the Due Process Clause of the Fourteenth Amendment to protect individuals from private violence.

*State Negligence*

As to Plaintiffs' state law negligence claims, Defendants maintain that they have discretionary immunity pursuant to Louisiana Revised Statute 9:2798.1(B).[25] In determining whether discretionary immunity applies, the duty-risk analysis is used to determine whether public entities and their officers and employees are liable.[26] The Louisiana Supreme Court case, *Hardy v. Bowie, supra*, provides the appropriate analysis as follows:

> Under the duty-risk analysis, plaintiff must prove that the conduct in question was a cause-in-fact of the resulting harm, the defendant owed a duty of care to plaintiff, the requisite duty was breached by the defendant, and the risk of harm was within the scope of protection afforded by the duty breached. Whether a duty is owed is a question of law. The inquiry is whether the plaintiff has any law – statutory, jurisprudential, or arising from general principles of fault – to support his claim. Governmental agencies in the performance of governmental functions may be subjected to the imposition of certain duties, the breach of which may result in liability for damages to those injured by a risk contemplated by that duty. The determination of whether a particular duty should be imposed on a particular governmental agency is a policy question. It is our role to determine whether there is any jurisprudential or statutory rule or policy reason why, under the facts and circumstances of this case, the state would owe a duty to plaintiff to compensate him for his injuries.
> Generally, a "police officer has a duty to perform his function with due regard for the safety of all citizens who will be affected by his action." "His authority must

---

[25] La. R.S. 9:2798.1(B) states the following:

B. Liability shall not be imposed on public entities or their officers or employees based upon the exercise or performance or the failure to exercise or perform their policymaking or discretionary acts when such acts are within the course and scope of their lawful powers and duties.

[26] *Hardy v. Bowie, et al,* 744 So.2d 606 (La.9/8/99).

9

at all times be exercised in a reasonable fashion and he must act as a reasonably prudent man under the circumstances." Officers are held to choosing a course of action which is reasonable under the circumstances. (citations omitted)

The duty-risk analysis obligates Plaintiffs to (1) enunciate the duty owed to them; (2) prove that the requisite duty was breached by the defendant; (3) prove that the conduct in question was a cause-in-fact of the resulting harm; (4) and prove that the risk of harm was within the scope of protection afforded by the duty breached.[27] In evaluating an officer's conduct under a given set of circumstances, the officer is not required to used the "best" or even the "better method of handling a situation.[28] The officer is required to choose a course of conduct which is reasonable under the circumstances.[29]

Defendants argue that the Sulphur Police Officers acted reasonably in the investigation and handling of the complaints made by the Smiths. Defendants assert that this is so because on each of the four occasions that the Smiths called the Sulphur Police, officers were dispatched to investigate the situation. Defendants also assert that the NCIC report showed no outstanding warrants, no probation, and no protective orders.

On the other hand, Plaintiffs argue that the Sulphur Police Department owed an affirmative duty to choose a reasonable course of action, citing *Hardy, supra,* and that they have come forward with substantial evidence to prove that the Police Department breached its duty to them.

The Supreme Court in *Hardy, supra,* held that the Lafayette Police department "had the

---

[27] *Hardie,* 744 So.2d 606, 613.

[28] *Mathieu v. Imperial Toy Corp.,* 646 So.2d 318 (La.1994).

[29] *Id.*

affirmative duty to choose a reasonable course of action in investigating . . ."[30] In *Hardy,* a rowdy crowd in Lafayette evolved into a fight and ultimately a fatal shooting. The Court was asked to determine whether the City of Lafayette should be insulated from liability where its Police Department failed to prevent a fatal shooting.

On the night in question, Lafayette Police officers were assisting in moving crowds out of bars. A loud bang was heard that sounded like a gun shot. Two officers immediately headed across the street in search of the cause of the noise. People were telling the officers, "there's a black guy with a gun." When the two officers reached the open parking lot across from the bar, a group of about thirty men were beating a young black man. The officers broke up the fight but did not find a gun. Several people from the crowd then told the officers that the man with the gun was further into the parking lot. The officers then went further into the parking lot, and as they attempted to get through a crowd of about 100 people, they heard two more loud bangs that were determined later to be gun shots.

Testimony revealed that while the 30 men were beating up the young black man, another man pulled out his gun and fired a shot in the air as a "warning shot." After that shot, the man being beaten and his friend retreated towards their car with the defendant in the case following them. The defendant tried to prevent them from leaving. A fight ensued resulting in Defendant shooting and killing one of the two men.

Under the duty-risk analysis, and considering all of the facts and circumstances of the case, the court held that the law enforcement officers had a duty to act reasonably to investigate a possible violation of the law and to protect citizens who may be harmed by the violation. When the officers

---

[30] *Id.* at 614.

heard what they thought was a gun shot, they had the affirmative duty to choose a reasonable course of action in investigating the shot and restoring peace and tranquility. However, the court also determined that the officers reasonably discharged their duty when the fatal shot occurred. After they heard the warning shot, they immediately went out to the parking lot to investigate. When they heard from the crowd that a black man had a gun, they proceeded to look for a black man and in the course of their search broke up a fight in which a black man was being beaten by a large group of men. From that location, they could not see the car where the victim was shot. The police officers had not identified the defendant as the individual who was alleged to have the gun, and they had no information that defendant was going to attempt to shoot anyone. The victim was not involved in the fight and thus the warning shot was not directed at him. The court determined that the police officers acted reasonably under the circumstances in the performance of their duties.

Plaintiffs have presented the following evidence to demonstrate that material factual issues exist regarding the reasonableness of the Sulphur Police officers' actions in the instant case.

Defendants in their statement of material facts assert the following which Plaintiffs dispute:

> (1) On March 25, 2004, while at Mahaffey's apartment to investigate the complaint of spiders, Mahaffey pushed Joseph Smith. Disputed: Mahaffey tried to knock Mr. Smith over the second floor balcony onto the concrete parking lot below.

> (2) Although Mahaffey appeared compulsive, Officer McKenzie did not detect anything that reflected Mahaffey presented a risk of danger to the Smiths and appeared to understand the ramifications of his actions. Disputed: Officer McKenzie saw evidence of mental illness in Mahaffey's conduct and in the way he kept his apartment, saw Mahaffey initially resist arrest and glare into McKenzies's eyes, heard the complete history from Mr. Smith including the balcony attempt, and held in his hands Mahaffey's NCIC report referring to the man Mahaffey shot and killed in Mississippi.

> (3) Officer Chester Gremillion was dispatched to the apartment complex to investigate the complaint involving the door sweep. Mr. Smith advised Officer

12

Gremillion of what he had witnessed and told him of the battery that had occurred the day before. Disputed: Mr. Smith told Officer Gremillion much more; he told Gremillion the whole story.

(4) Captain Morrison went to the apartment complex to speak with Mahaffey on March 30, 2004. Mahaffey refused to speak with Captain Morrison regarding the door sweep and invoked his Miranda rights. Disputed: Officer Morrison acknowledged in his deposition that Mahaffey admitted to ripping off the door sweep.

(5) Mahaffey did not admit to damaging the door, but rather exercised his right to remain silent. Disputed: Officer Morrison acknowledged in his deposition that Mahaffey admitted to ripping off the door sweep before invoking his right to remain silent.

(6) Because the misdemeanor simple damage to property had not occurred in his presence or in close proximity, Captain Morrison could not arrest Mahaffey. As a result he sent the complaint to the City Prosecutor for further handling. Disputed: Morrison promised the Smiths that he would arrest Mahaffey if Mahaffey admitted to ripping off the door sweep. Morrison promptly broke that promise.

(7) During the period of time that Captain Morrison was with Mahaffey he did not detect anything that indicated to him that Mahaffey posed a threat of violence to the Smiths. Disputed: Morrison had access to more information than any other police officer involved, such as Mahaffey's NCIC report run by Officer Bagwell; the report referring to Mahaffey's shooting and killing of a man in Rankin County Mississippi; Morrison heard the whole story from Mr. Smith about the escalating problem at the apartment complex.

On March 23, 2004, Mahaffey started exhibiting peculiar behavior when he asked Mr. Smith the following: "What would you do if someone tried to hurt your family?" "What if someone pulls a gun out and shoots you so you can't protect your family?" "So what if the person is faster than yours, you couldn't stop them could you?"

Mahaffey's behavior progresses from peculiar to threatening. On March 24, 2004, Mahaffey beats on the Smith's trailer door to complain about a spider. The Smiths call the exterminator to re-spray the apartment. That same day, when Mr. Smith and the exterminator are in Mahaffey's

13

apartment, Mahaffey assumes a fighting stance and starts yelling and cursing Mr. Smith. Mr. Smith contacts Officer Bagwell of the Sulphur Police Department to inquire about Mahaffey's criminal background.

On March 25, 2004, Officer Bagwell contacts the Smiths and informs them that "Mahaffey doesn't have anything that we should be concerned with. He's not dangerous you don't have anything to be worried about." Bagwell told the Smiths that Mahaffey's NCIC report showed only two altercations with police officers, one in Beaumont and one in Tyler. Officer Bagwell assures Mr. Smith, "Mr. Smith, you and your family have nothing to worry about."

The NCIC report, in fact, revealed that Mahaffey had been arrested for murder. In his deposition, Bagwell stated that he did not recall seeing the murder arrest on the report. The NCIC report directed the inquiring officer to contact the arresting agency for additional information. Bagwell did no further investigation regarding the NCIC report.

On March 25, 2004, Mahaffey again complained to the Smiths about a gap in his front door and a new spider web in his kitchen. Mr. and Mrs. Smith went with Mahaffey to his apartment to investigate the gap and the spider web. Mahaffey pointed to the kitchen ceiling where he claimed the spider had made its web; there was no spider. Alarmed, Mr. and Mrs. Smith immediately rushed for the door. Mahaffey started yelling and cursing them. Mrs. Smith exited first, and as Mr. Smith was passing through the door, Mahaffey shoved/pushed Mr. Smith. Mr. Smith testified that Mahaffey tried to shove him over the second floor balcony. The Smiths called the Sulphur Police Department. Patrolman Thomas McKenzie investigated and reported that the injuries on the side of Mr. Smith's face were consistent with his account of the incident.

Because Mahaffey left the apartment, no arrest was made. The Smiths informed McKenzie

about Mahaffey's threatening behavior as well as the events that had occurred in the past few days.

When Mahaffey returned later that day, McKenzie and a reserve officer came back to the apartment and arrested Mahaffey. When the officers attempted to place Mahaffey under arrest, he resisted, refusing to place his hands behind his back.

KcKenzie issued Mahaffey a misdemeanor ticket and allowed him to go home. The Smiths complain that Mahaffey should have been charged with a felony which would have required a bond to be set. KcKenzie admitted running a NCIC report, but he also failed to notice that Mahaffey had been arrested for murder.

On Friday, March 26, 2004, the Smiths installed a metal door sweep and vinyl weather stripping under the front of Mahaffey's apartment. They also started eviction proceedings and had the Marshal post an eviction notice on Mahaffey's door which read "violent with landlords and disorderly conduct." When Mahaffey returned home, the Smiths observed him read the notice, then rip the new door sweep off the door with pliers.

Mr. Smith called the Sulphur Police Department. Officer Chester Gremillion responded. Again, Mahaffey had left the apartment complex. The Smiths informed Gremillion about the escalating conflict and Mahaffey's peculiar and threatening behavior. Officer Gremillion inspected Mahaffey's apartment and found the damaged door sweep lying just inside the door. Officer Gremillion testified that he recognized that the apartment looked "like somebody had obsessive compulsive disorder." Officer Gremillion prepared an offense report after Mr. Smith demanded it.

On March 27, 2004, the Smiths discovered that a window in Mahaffey's apartment had been busted out. The Smiths called the Sulphur Police Department. Officer Craig Doucet responded. The Smiths again informed Officer Doucet of the previous days' events, and Mahaffey's peculiar

15

and threatening behavior. Officer Doucet informed the Smiths that the broken window was a civil matter and refused to prepare an offense report. Mahaffey was never questioned about the broken window.

On March 29, 2004 the Smiths delivered typed statements to the police department as instructed by Officer Doucet and met with Detective William Morrison. Detective Morrison also had the Smiths handwritten statements previously given to Officer McKenzie regarding the balcony incident. Detective Morrison interviewed the Smiths who told him of all of the previous days' events as well as Mahaffey's peculiar and threatening behavior. Detective Morrison instructed the Smiths to call him when Mahaffey returned to his apartment.

Later that day, Mahaffey returned and the Smiths called Detective Morrison. Detective Morrison met with the Smiths at their home before interviewing Mahaffey. The Smiths testified that Detective Morrison assured them he would arrest Mahaffey if he admitted to destroying the door sweep. Detective Morrison testified that during the interview, Mahaffey admitted to removing the door sweep. Mr. Smith testified that Captain Morrison told him that, "I don't think you have anything to worry about, he said he's not going to do anything or tear anything else up in the apartment." Mr. Smith told Detective Morrison that Mahaffey hollered from the top of the balcony – "See the cops won't do nothing to me! I am going to get you! I am going to get you!" Detective Morrison did not arrest Mahaffey. Detective Morrison testified that he told Mr. Smith that he, "didn't think he [Mr. Smith] had anything to worry about. . . ."

Detective Morrison did not run the NCIC before interviewing Mahaffey, nor did he know that two of his fellow officers had already done so. Detective Morrison never consulted the other officers who had investigated the previous incidents. Detective Morrison testified that he thought the Smiths
16

were "overdoing it" and that they were the problem.

On March 31, 2004, Mahaffey executed his last will and testament at Oliver Schrumpf's officer in Sulphur.

On April 1, 2004, Mahaffey shot Mr. Smith with a shot gun three times, drove to his step-daughter's house in DeQuincy and committed suicide.

After the incident, Mr. Smith contacted the detective who investigated the murder that Mahaffey had been previously arrested for. The detective told Mr. Smith what he knew of the murder. Mahaffey was living with a divorced woman in Texas. The woman's daughters were living with their father in Mississippi. Mahaffey and the woman drove to Mississippi to take the children. Mahaffey shot and killed the children's father with a shotgun. Mahaffey was tried and acquitted.

The Smiths maintain that the motion for summary judgment should be denied because there are genuine issues of material fact and law as to whether the Sulphur Police Department acted reasonably under the circumstances. The Smiths maintain that the Sulphur Police Department increased the risk of harm to the Smiths by reassuring them that Mahaffey was harmless. The Smiths contend that they had made tentative arrangements to leave town until Mahaffey was evicted. Based on these reassurances, they decided to stay. The Smiths further argue that the Police Department should have (1) warned them of the homicide/murder arrest on the NCIC report, (2) obtained information about the homicide, (3) informed the Smiths that they were prohibited from disclosing certain NCIC information, but warned them to be careful regarding Mahaffey (4) directed the Smiths to the appropriate Mississippi and Texas authorities to find out for themselves about Mahaffey's criminal history, (5) held Mahaffey for 72 hours for a psychological examination as provided by Louisiana law to determine whether he posed a danger to himself or others.

The court finds that the Smiths have presented sufficient evidence to create a genuine issue of material fact and law for trial as to whether under the duty-risk analysis, the Sulphur Police Department owed an affirmative duty to the Smiths and then breached that duty.

## CONCLUSION

Based on the foregoing, the motion for summary judgment as to the federal claims will be dismissed with prejudice. The motion for summary judgment as to the state law negligence claim will be denied. This Court has original jurisdiction over the instant matter based on 28 U.S.C. § 1331. However, the Court is inclined to retain supplemental jurisdiction over the remaining state law claim pursuant to 28 U.S.C. 1367(c).

THUS DONE AND SIGNED in Chambers at Lake Charles, Louisiana, this 12th day of April, 2006.

JAMES T. TRIMBLE, JR.
UNITED STATES DISTRICT JUDGE